5-13-52 People v. Spade 5-13-52 This case presents the court with a juridical equivalent, the story of a trial attorney who made an equivalent mistake. As a consequence, my client was not only denied effective assistance of counsel, he essentially had no assistance of counsel, and in some respects even negative assistance of counsel. The argument for ineffective assistance of counsel in this matter is compelling. However, this court need not decide this case on that ground and place a blemish on the career of an attorney who I understand has since retired. On this appeal, we present an equally compelling argument that the state simply failed to prove the elements of theft over $500 beyond a reasonable doubt, and therefore a judgment of acquittal should be entered in this case. By way of summary on this point, under the statute under which Mr. Spade was charged in count three, the count on which he was convicted, it was the state's burden to prove that the defendant reasonably should have known that the property over which he took possession was stolen at the moment in time in which he first came into possession of it. The state failed to do this with respect to all three items. With respect to the ring, there was a complete failure to prove beyond a reasonable doubt that Mr. Spade ever possessed that ring. In other words, that the ring pawned by Mr. Spade was the ring stolen from the items, which we describe in the brief as the Blu-ray and the small TV. Since the court properly discredited the real burglar's testimony, Mr. Ottey, that Mr. Spade had participated in the burglary, the only evidence of circumstances under which Mr. Spade came into control of the Blu-ray and the small TV came from the defendant himself and Detective Mullins, who was basically repeating the same testimony. And yet there was no evidence from either of these witnesses that at the time he obtained either of these items, it was under such circumstances as would reasonably induce him to believe the property was stolen or that he was somehow depriving the rightful owners of the use of this property since he didn't know there were rightful owners. Specifically with respect to the Blu-ray, the testimony was that Mr. Ottey sometime after the burglary, I believe it was about a month and a half, gave the Blu-ray to Mr. Spade as a gift for thanking him for helping lift the large TV up to his apartment under circumstances in which he didn't know that a burglary had occurred. And after Mr. Ottey had obtained an X-Box so that he didn't need the Blu-ray anymore, so this didn't even create an inference that would cause Mr. Spade to be suspicious about the gift. And with respect to the small TV, this was a circumstance in which over a period of weeks, Mr. Ottey, the real burglar, had tried to sell the small TV to Mr. Spade, Mr. Spade said, I already have a couple of TVs, I don't really need it. And after dropping the price from $200 to $100, Mr. Ottey finally says to Mr. Spade, here, why don't you just take it for a while, try it out, and then if you like it, you can pay me. Nothing about any of these circumstances that would reasonably induce him to believe that these items were So, with respect to the ring, the most valuable item, there was a complete disconnect between the testimony establishing that a ring was stolen from the Williams' and the evidence that Mr. Spade pawned a ring for $30. There was no affirmative evidence introduced in this case whatsoever linking the two events in establishing the identity of the corpus delecti, nothing that puts the stolen ring in Mr. Spade's possession. In fact, Exhibit 7, the receipt from the pawn shop that both sides seemed to agree was so much hieroglyphics, corroborates Mr. Spade's account, because it was Mr. Spade's account that he received three items from the witness, Leah Gallin, and in fact, he pawned three items, a ring, a watch, and a bracelet, and the total value of all three items being $40. But the main point is that there is no affirmative evidence linking these two items. The State cannot leap across this evidentiary chasm without falling in with fatal results to its case. And I might add that this is an argument that should have been made by trial counsel, but never was, which kind of takes us into issue two. But in summary, this was a complete and because it wasn't made fully cognizant by counsel that the State's burden of proof on this, that the statute under which Mr. Spade was charged, was that at the time he came into possession of the property, it should have reasonably induced him to believe it was stolen, and there simply wasn't that evidence here. With respect to the second issue, the record in this case demonstrates that Mr. Spade was represented by an attorney who struggled throughout the trial to speak in complete, coherent sentences and ask intelligible questions. He failed to introduce vital evidence, for example, never even asking Mr. Spade, his client, he objected to evidence of the State having a plea agreement with the principal witness against him, Mr. Ottey, and whose closing argument was largely incoherent except for criticizing the trial judge. And then this was followed by a motion to reconsider a sentence that accepted Mr. Spade's conviction, but requested its reduction to a misdemeanor when there were grounds to attack the entire conviction, as I've just laid out for you. So is your argument with respect to counsel that it was so ineffective that you don't need to show prejudice? That is correct. Because I'd be interested in... We argue in the alternative. Yeah, I understand that, but I really would like to hear your argument with respect to the first part. Well, frankly, Your Honor, I think the chronic standard has been met here because the record is simply replete with an attorney, again, who simply, for most of the trial, had trouble even formulating coherent questions that the court could understand. And I appended in the appendix that I attached to our opening brief, we cite some of the worst instances to that, but it fairly leaps off the pages of the record in this case. What I didn't include in the appendix were the many occasions in which it was really more sins of omission than commission, where he was silenced. He declined all cross-examination of state witnesses Ottey, Detective Mullins, Briglove, the landlord, Robert Johnson, Leah Gallant, and then the small amount of cross-examination he did of the victims and Chief Ackman were meaningless. He asked the victims, well, did the police take any fingerprints? That was the beginning and the end of the cross-examination of the two victims. And with Chief Ackman, he asked questions that were nonsensical. Are you going to turn the TV on? It's in the courtroom. Quite honestly, Your Honor, just looking at the record in this case, I urge you to just read the trial transcript as much as you can stand, and it gives every indication of an attorney who is non-compensementist. And as I indicated in drawing analogies to other cases where the chronic standard was met, it's the equivalent of the attorney who falls asleep. One more question is, he did win two out of three. Is there a case that says anything about that? Yes, we did cite it in the brief that simply because an acquittal on some charges doesn't mean you can't meet the standard. And I cited it was the Velasco case. And the other, I think, more common sense argument is given that a defendant doesn't have to put on any defense at all and may still be acquitted, it follows logically that you can be represented by a completely ineffective counsel and still be acquitted. And that, I would submit, is what happened here. He was acquitted on two out of three. And if you turned on the TV and it didn't work, what would it be worth? I'm sorry. What are these new TVs? I don't know, was it a flat screen? I assume. It mentioned size, didn't it? The flat screen TV, the large one, was the one that the burglar, Ottey, stole. My client was charged with having a smaller TV that was viewing... Was it a flat screen? I don't know. It just said, I think, it was a 22-inch. I don't think it said it was a flat screen. If you turned it on and it didn't work, is it worth anything? I don't think it was. I don't think that it was turned on. I think what happened... He said, would you plug it in? Did he say turn it on or something like that? You're talking about two different things. Yeah, he asked, during his cross-examination of Chief Ackman, so all cross-examination, he asked him if he was going to turn on the TV. Okay, and he never did. He never did. So you don't know if it worked or not. This is not the TV that was supposedly stolen, though. Oh, okay. This is maybe... Well, it was... It was stolen. In the courtroom. Well, actually, we don't know from the record for sure. I presume he was referring to one of the exhibits, which were present. Oh, okay. In the courtroom. Okay. So it's worth nothing if it doesn't work properly. Or almost nothing. Well, but we don't know that it doesn't work because... We don't know because we have turned it on. The court... Was asked to. Right, exactly, and the court, I think, put an end to that and asked for a sense of... But didn't he supposedly have the TV for a period of time that he was trying out? Yes, he did, and he did admit that he had it for a period of time based on this proposition that he tried out for a while. Then when Chief Ackman came by and inquired by the apartment and asked Mr. Spade about what property that Mr. Otti had, it was at that point in time that Mr. Spade started to get suspicious and wondered if this might be stolen property. But at the time he acquired it, he had no reason to conclude that whatsoever. Thank you, counsel. All right, thank you. You'll have your final time. May I please score? Counsel, my name is Sharon Chanahan, and I represent the people of the state of Illinois. I'd like to begin with three quick points before moving on to defendants issues one and two. The first is the motion this court took with the case regarding citation to judice.com. I'd like to briefly address this because it seems to be a recurring problem. The judice homepage states in the uncertain terms, and here I'm quoting, this page is operated by judice.com, not the court. Links to this page do not constitute endorsement by any court of the content, policies, or services offered here. So that's the first line of judice. Now, we've made some rulings, not necessarily with regard to this case, but are you aware of other rulings we've made with respect to judicia.com? I have no published opinions that deal with judicia.com. I do know that in another case that has been briefed, not before this court, that you found, in fact, I believe it's one that Ms. Horn and I have together, that in that case, in this case, the motion was filed. It was taken with the case, the motion was filed just 10 days ago, and this court took that motion with the case, too. So, as far as I'm concerned, you have both of those motions pending before you dealing with judice.com. I've never quite, my Latin is not what it should be. But in any case, I think I'd like to see this court address it. It is, I can remember an argument not too long ago, Justice Chapman, and you were discussing citation to Wikipedia, where you can go in and change things. And so, I think, like I said, I think it's important that we start discussing judicial notice of internet websites. Given the fact that GDC, by its own declaration, says that its records are not court records, I don't think they're in any way comparable to certified report of proceedings that transpire before the circuit court. And I would note the very definition of judicial notice is facts proven by immediate and accurate demonstration by resort to easily accessible sources of indisputable advocacy. Given the fact that GDC says that they're not endorsing the content and saying that this is the content of the court, they abysmally fail in that definition. I would also note that People v. Hill, which was filed as supplemental authority on this motion by the state, says, just what I just said, just what Your Honor said when we were talking about Wikipedia, the Hill court cautioned parties from engaging in this practice of from the internet without leaving the court. So that's all I have to say about that. As I say, I wanted to talk about it because it is a recurring problem. It's always come up in motion practice. This is, I think, the first opportunity that anyone has had to address it in court. As far as issue three, I would note that issue three deals with the ring and whether there was compelling evidence that the ring he pawned was not Ms. Williams' ring. That issue is so derivative of issue one. It deals with the same thing that I don't see any point in addressing it separately. I would note that the defendant says in a little argument here today that the receipt is so much hieroglyphics. And yet, in his opening brief, the defendant relied on that very receipt to prove that the ring that was pawned was not the ring that Ms. Williams had stolen from Ms. Williams. So it sort of sounds like defense counsel is backing off of this claim that the receipt, if he says, if he agrees that it's hieroglyphics, then I don't see how I can rely on it to establish what the ring did or did not contain. And finally, as far as issue four, restitution, in his reply brief, defendant accuses the state of, and here I'm quoting, presenting a colorful blend of fact and fiction, inventing the premise that Mr. and Mrs. Williams had replaced the TV and Blu-ray player. And he asks this court to, again quoting, decline the state's offer to simply make up factual findings. Before a counsel cavalierly makes vituperative accusations that the state is making up facts, he should consult the record on appeal. As reflected in the state's brief, page C-176 of the record includes the testimony of Diane Williams, the owner of the stolen property, who testified that the stolen items had been replaced. Moving on to the issue of ineffective assistance of counsel, I'd like to address the chronic issue. Justice Welch, I believe you recognize this fact that it's hard to say that a trial attorney provided no assistance at all when he obtained an acquittal on two of the three charges. I would also note, and this applies to both the chronic argument and the Strickland argument, that Mr. Douglas provided very good, very strong alibi defense in this case. It was really, I mean, I don't know what else you can present in this case that could have been any stronger. There's the testimony not only of the defendant, but his son and his brother, that the defendant wasn't even in town that night. He went to his son's for a while. Then he left. He drove to Indiana. He spent the evening, Christmas night evening, with his brother. They talked. They drank. He spent the night. And he came home the next day. That was all presented by Mr. Douglas. And so to say that a man presented- But apparently it wasn't very convincing. You can't. You can only present the evidence. Whether it's believed by the finder of fact is never- I know that you say that he parsed language, and when reading the record, we'll get to see the totality of it. But when you have the judge repeatedly saying, Mr. Douglas, I have no idea what you're saying, and we all read those sentences, and I had no idea what he was saying. And I would point out that what the sentences are, you have read just those sentences. Right. And there's no doubt, this is an elderly lawyer. He had a stroke. I think his mind was just as sharp as it had ever been. But he had- I guess that's the question. But he had trouble. He definitely had trouble speaking orally. I would not dispute that. Sometimes he did a great job. Sometimes he tried to get something out. It didn't come out. He kept working on it, and he got it out. Sometimes he tried to get something out, and the trial court helped him out. I don't understand what you're saying. Are you saying this? Yes. But that's not really what a trial judge should have to do. I have to say, I've known Bob Douglas a long time. And reading what was cherry-picked in these briefings, I just couldn't even believe that that would be him. And don't you think a defendant is entitled to a good lawyer, or at least competent lawyer, 100% of the time, as opposed to, at times, he would do this? He obviously had cognitive difficulties. I'm not sure he had as much cognitive difficulty as he did just verbalizing. Verbalizing. Well, but that's when I say cognition. He can't give it back to you. He may have understood the cognitive meaning. He couldn't get it back out. But at times, it appeared he was totally confused. But the question is, I think, I'll put, let me back up the chronic just briefly, to say that an attorney that gets a conviction on two or three accounts that presents a good alibi defense, presents no argument at all, I don't think you can say that. I guess the opposite side to that is he may not have been convicted on any of the accounts if he had an attorney that was- Well, that's the defendant's argument. That's the defendant's argument in a nutshell. But to say chronic says nothing. You did nothing. And I don't think you can say this attorney did nothing. And as far as Strickland, again, I think you have to buy the defendant's first argument that there were all of these problems with the evidence to then say, well, obviously defense counsel was prejudiced. He has to be prejudiced under Strickland. He has to be prejudiced. You have to say that, and I'm, this is a case where you've got to go through the whole thing, read it, read the strength of the evidence against the defendant, and determine whether there was any prejudice to the defendant. Thank you. Thank you. Thank you, Your Honors. I think as Justice Cates just alluded, the Sixth Amendment guarantees a right to effective assistance of counsel, not effective assistance of counsel when occasionally helped by a judge, when counsel falters, which occurred repeatedly throughout this case. With respect to counsel's argument that, well, sometimes he did a great job. Number one, show us where. Number two, if you follow the state's logic on this, this means that an attorney that, say, falls asleep during critical points of the trial cannot be shown to have met the chronic standard if the state can show, well, he was awake during other parts of the trial. That's basically the analogy that we would draw to that. It doesn't make sense. Throughout the trial, there were these serious problems, and I would agree with the state, though, by all means, read the record. I think it speaks for itself loud and clear on that point. With respect to the stolen items and whether they were replaced, if I missed something in the record, I do apologize. However, that was not really the main point. The record doesn't say when the items were replaced. The state made an argument, and this is a tertiary argument. I don't think we need to get there. But if we get to argument four, issue four in this brief, then the point that they were trying to make is that Mr. State should have been held accountable for the rental value of these items for four years. We don't know it's four years. That's not addressing what the statute says, that they're entitled to some kind of set-off for the value of items that are returned, and that was simply not done here. Even if the victims had replaced the items, that doesn't mean that the value of the items that were returned suddenly disappears to zero. The statute had to be followed. It was not done in this case. With respect to the issue that was taken with the case, the issue of judici, I'm not going to belabor this. I think I answered it about as thoroughly as I could in the motion in response to the objection. I would simply say judici is not Wikipedia. Yes, the records are not court records per se, but they are provided by circuit clerks, just as circuit clerks are responsible for the docket sheets and so much of the other of the court records that we rely upon for accuracy. It's a third-party service that provides this. The Supreme Court has links on its website to judici for purposes of paying fines and fees in some kinds of cases, and in this case, what we sought to use it for was regarding whether or not Mr. Adia paid fines and fees in the other case and so on, things of which I think this court can find are of indisputable accuracy for those purposes. Nonetheless, out of an abundance of caution, I did also file a motion for relief to supplement the record with the actual court records from Mr. Adia's case in the event that the court disagrees with our position on this issue, and we would ask that that be granted if the court finds against us on the judici issue. Finally, I would note, conspicuous by its absence in the State's argument here, is any response to the complete failure of proof, in other words, argument one, that even giving the prosecution the benefit of any inferences, there was still ... The standard was not met. The State did not prove its case beyond a reasonable doubt, and have Mr. State have had effective assistance of counsel during trial, I'm confident that that would have been pointed out. The discrepancy between Exhibit 1 and Exhibit 7 would have been pointed out, and the complete failure of proof and the statutory standard that wasn't met would have been pointed out, but instead, Mr. Spade got a closing argument that didn't call attention to any of these things. He never got to testify at a trial about his pointing of the ring and what the ring looked like or any of that because he wasn't asked, and this is where the two issues intersect, but even with ineffective assistance of counsel, the State failed to make its case, and I believe that if you look at the relevant statute, that you will conclude that that is indeed the case and enter a judgment of acquittal for Mr. Spade. Thank you.